FEE PAID

Julian Brew (SBN 150615)
julian@cypressllp.com
**CYPRESS LLP**
11111 Santa Monica Boulevard, Suite 500
Los Angeles, CA 90025
Telephone:  424-901-0123
Facsimile:   424-750-5100
Attorneys for Plaintiff-Relator,
**RELATOR, LLC**

FILED
CLERK, U.S. DISTRICT COURT

JULY 12 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____EEE_____ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>    Plaintiff,<br><br>*ex rel.* **RELATOR LLC**, a California limited liability company,<br><br>    Relator,<br><br>    v.<br><br>**MAURICIO UMANSKY**, an individual, **WILLIAM ROSE**, an individual; **THE AGENCY HOLDCO, INC.**, a Delaware corporation; and DOES 1-10,<br><br>    Defendants. | Case No.<br><br>LACV23-05625-SB(PDx)<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT**<br><br>**FILED *IN CAMERA* UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT PLACE ON PACER**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiff RELATOR LLC (hereinafter referred to as "Plaintiff") complains of **MAURICIO UMANSKY**, an individual (the "Umansky"), **WILLIAM ROSE**, an individual **(**"Rose", together with Umansky, the "Individual Defendants"), **THE AGENCY HOLDCO, INC**., a Delaware corporation ("The Agency"); and DOES 1-10 (together with the Corporate Defendant and the Individual Defendants, collectively, the "Defendants"):

**JURISDICTION & VENUE**

1. This Court has subject matter jurisdiction over the Plaintiff's claims brought under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730 and 3732.

2. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at all times material hereto, Defendants transacted business and are found in the Central District of California, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.

3. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because The Agency is headquartered in the Central District of California. Defendants also do business in Los Angeles County in the Central District of California. Acts that form the basis of this Complaint occurred in the Central District of California.

4. Relator's claims and this Complaint are not based on any prior public disclosures of the fraud or transactions in a criminal, civil, or administrative hearing in which the Government or its agent is a party, a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation or from the news media. To the extent that there was any public disclosure unknown to Relator, it is the "original source" as defined in 31 U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily providing this information to the United States Government prior to filing this *qui tam* action.

# INTRODUCTION

5. This is a case about greed during a national health emergency. Umansky and Rose through The Agency, a corporation that they formed in October 20, 2017, applied for and received two Payroll Protection Program ("PPP") and CARES Act loans in the total amount of $3,521,153.00. Those two programs were enacted for the sole purpose of preventing termination of employees by providing loans to businesses that were unable to pay them due to the impact of COVID19, not to bolster or preserve the profits of a business that had sufficient funds available to pay its employees. Yet, the vast majority of the proceeds went to those very businesses, leaving many small businesses like restaurants, grocers and other small businesses that were directly impacted by COVID19 through lost business out in the cold.

6. Many of the large, profitable businesses obtained their loans by misrepresenting their financial situations, claiming their businesses were eligible when they were not, or by misrepresenting how the funds would be used. These businesses knew they were not the types of businesses the PPP was intended for but the lure of easy and cheap money and minimal oversight was too great. Instead of helping small businesses and their employees as intended, much of the funds that were made available were used to line the pockets of millionaires and billionaires and increase the profits of large and highly profitable companies which were not as impacted by COVID19 or had ample funds to remain in business and maintain their employees. Their size, resources and access to professionals enabled them to win the race for most of the loans over those who truly needed them.

7. This case involves one such business an Office of Real Estate Agents and Brokers ("RE Agents") The Agency, and its founders and owners Umansky and Rose. Defendants' business involved advising buyers and sellers in connection with the sale of luxury real estate. Their profits would have been minimally impacted if at all, because their revenue was based on a percentage of real estate

transactions, typically between millionaires and billionaires, not consumers who were unable to buy goods or dine out because of the COVID19 restrictions. In fact, The Agency's business grew massively during the COVID19 pandemic. In 2019, The Agency had $6 billion in sales volume. The Agency's sales volume grew to $6.5 billion in 2020 and ballooned to $11.2 billion in 2021.

8. Despite this, in order to receive the loans, Defendants falsely certified that "current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant" and that they needed the loans to pay their employees, a requirement for eligibility for PPP loans. In addition, the amounts they applied for and received exceeded the loan limit of 2.5 monthly salary with a cap of $100,000 annual salary per employee. In addition to receiving loans based on these false certifications, Defendants later applied for and received full loan forgiveness, knowing they were ineligible for the loans in the first place.

9. Plaintiff brings this action as relator on behalf of the United States to on behalf of the United States to recover treble damages, civil penalties, and costs under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33. Plaintiff gave notice of its intent to file and full disclosure of the evidentiary basis to the Department of Justice ("DOJ"), which did not elect to intervene within 60 days of filing. The only way this wrong can be remedied and the fraudulently obtained proceeds recovered for the benefit of taxpayers is through this action.

## THE PARTIES

10. Plaintiff, is a California limited liability company with its principal place of business in Los Angeles, California.

11. Defendant Mauricio Umansky is an individual and, at all relevant times herein, is and was a co-equal owner and Chief Executive Officer of The Agency.

12. Defendant William Rose is an individual and, at all relevant times herein, is and was a co-equal owner and President of The Agency.

13. Defendant The Agency Holdco, Inc. is a Delaware corporation with its principal place of business in Beverly Hills, California.

### The CARES Act and Paycheck Protection Program

14. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act" or "the Act") (Pub. L. 116-136) became law and provided emergency assistance and health care response for eligible individuals, families, and businesses affected by the coronavirus pandemic. SBA received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

15. The CARES Act authorized loans to eligible small businesses struggling to pay employees and stay in business as a result of the devastating effect of the COVID-19 pandemic and resulting restrictions.

16. Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck Protection Program" ("PPP").

17. On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) was enacted to provide additional funding and authority for the PPP. On June 5, 2020, the PPP Flexibility Act of 2020 (Flexibility Act) (Pub. L. 116-142) was enacted, changing key provisions of the PPP, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans.

18. Under the PPP, in 2020, eligible businesses could obtain one SBA guaranteed PPP loan. Businesses were required to spend all loan proceeds only for employee compensation, rent or mortgage, and certain other specified expenses. Depending on their use of the loan proceeds as certified, they could qualify for loan forgiveness, up to the full amount of the loan.

19. The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. In order to obtain a PPP loan, an eligible business (through its authorized representative) had to sign and submit a PPP loan application (SBA Form 2483) online through the lender's platform. The PPP loan application (SBA Form 2483) required the business (through its representative) to acknowledge the PPP program rules and make certain certifications in order to be eligible to obtain the PPP loan, including certifying that their certifications were true.

20. Once the Borrower submitted its PPP loan application (SBA Form 2483) to a Lender, the participating lender processed the PPP loan application. If a PPP loan application (SBA Form 2483) was approved by the lender, it funded the PPP loan with its own funds, which were 100% guaranteed by the SBA.

21. After the Lender processed and approved a borrower's PPP loan application (Form 2483), but prior to the closing of the PPP loan, the Lender submitted to the SBA, the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) to the SBA applying for a guarantee on the loan. For a PPP loan to be approved, the Lender was required to Answer Yes to the following questions in the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) as to the Borrower's certification of its General Eligibility to receive a PPP Loan:

| | | Yes | No |
|---|---|---|---|
| • | The Applicant has certified to the Lender that (1) it was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099MISC; (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant; (3) the funds will be used to retain workers and maintain payroll, or make payments for mortgage | ☐ | ☐ |

| | |
|---|---|
| interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures; and (4) the Applicant has not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)). | |

SBA Form 2484 (emphasis added). Therefore, if a PPP borrower lied on its PPP loan application (SBA Form 2483), the PPP borrower's false certification caused the Lender to submit to the SBA with respect to that PPP Loan, a Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) that contained the PPP borrower's False Statement.

22. SBA Form 2483 includes the following certification, among others: "I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them" (the "Understanding Certification").

23. SBA Form 2483 also includes the following certification, "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)" (the "Eligibility Certification").

24. SBA Form 2483 also includes the following certification, among others: "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule" (the "Use of Proceeds Certification")

25. SBA Form 2483 also includes the following certification, among others: "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant" (the "Economic Necessity Certification").

26. SBA Form 2483 also includes the following certification, among others: "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud" (the "Worker Retention and Payroll Certification.")

27. SBA Form 2483 also includes the following certification, among others: "During the period beginning on February 15, 2020, and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program." (the "Single Loan Certification.")

28. SBA Form 2483 also includes the following certification, among others: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000" (the "No False Statements Certification").

29. After the borrower submitted a PPP loan application, it was processed by the participating lender. If the application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA.

Generally, in the event the borrower defaulted on the loan, the SBA would purchase the borrower's debt from the lender and be responsible for its repayment.

30. Under applicable SBA rules and guidance, recipients of PPP loans could apply to have principal and interest on the PPP loan fully forgiven, meaning that the borrower would owe nothing and would have no obligation to repay the PPP loan. To obtain full forgiveness of the PPP loan, borrowers had to attest that they had "not reduced the number of employees or the average paid hours of [their] employees" during the loan period, that the loan proceeds had been spent on payroll costs and other permitted expenses and that at least 60% of the loan proceeds had been spent on payroll costs (hereafter the "Loan Forgiveness Certification").

31. Loans could only be used for certain permitted expenses, such as to pay employees' salaries, employee benefits, mortgage interest, rent, utilities or worker protection costs related to COVID19.

32. On April 2, 2020, the SBA posted the First PPP Interim Final Rule announcing the implementation of the CARES Act. SBA posted additional interim final rules on April 3, 2020, and April 14, 2020. On April 28, 2020, SBA posted an interim final rule supplementing the previously posted interim final rules with additional guidance. See, Federal Register / Vol. 85, No. 82 / Tuesday, April 28, 2020 / Rules and Regulations at, 23450-52, available at https://home.treasury.gov/system/files/136/Interim-Final-Rule-on-Requirements-for-Promissory-Notes-Authorizations-Affiliation-and-Eligibility.pdf. This interim final rule supplemented previous regulations and guidance on several important, discrete issues. The April 28, 2020, Interim Final Rule was immediately effective without advance notice and public comment because section 1114 of the CARES Act authorized SBA to issue regulations to implement Title I of the CARES Act without regard to notice requirements. *Id*.

/ / /

/ / /

## DEFENDANTS' FRAUD

33. During round 1 of the paycheck protection program, The Agency applied for a PPP loan for **$2,395,297.00**. It was approved on April 12, 2020, by the SBA for an amount of **$2,395,297.00**. The loan was facilitated by MUFG Union Bank, National Association. The Agency received 100% of the approved amount. On its application for this loan, The Agency stated that it had 104 employees, thereby reflecting an average salary of $110,552.17 per year. Said loan hereafter referred to as the "PPP Loan 1."

34. During round 2 of the paycheck protection program, The Agency applied for a second PPP loan for **$1,125,856.00**. It was approved on April 2, 2021, by the SBA for an amount of **$1,125,856.00**. The loan was facilitated by MUFG Union Bank, National Association. The Agency received 100% of the approved amount. On its application for this loan, The Agency stated that it had 73 employees, thereby reflecting an average salary of $74,028.89 per year. Said loan hereafter referred to as the "PPP Loan 2." PPP Loan 1 and PPP Loan 2 shall collectively be referred to as the "PPP Loans."

35. In applying for and receiving the PPP loans, Defendants knowingly made false representations of fact in virtually all of the required certifications that are described above and required to be eligible. The PPP Loans were not necessary to support Defendants' ongoing operations and pay their employees' salaries, nor were they used for such purposes, because Defendants had ample liquidity to do so. Instead, they only bolstered Defendants' profits.

36. Defendants' business revolved around luxury real estate transactions of white-collar millionaires and billionaires who were not impacted by the pandemic. The Agency does not deal in starter homes, but luxury properties for the rich and famous, with their average sales price at $1.92 million. This contrasts with small businesses, such as grocery stores, restaurants and other companies that sell other products and services, and who depend on a voluminous flow of customers.

Defendants did not need that constant flow of customers to stay in business because they made significant profits from each luxury real estate transaction among their wealthy clientele.

37. Data available on Defendants' website shows that their profits increased substantially during the pandemic and that they continued to rapidly grow their business as they expected. The Agency's sales volume increased by $500 million in 2020, rising from $6 billion in 2019 to $6.5 billion in 2020. Their 2020 growth was eclipsed by their massive growth in 2021. In 2021, The Agency increased its sales volume by $5 billion (i.e. 69%), from $6.5 billion in 2020 to $11.2 billion in 2021.

38. Unlike other businesses that suffered during the course of the pandemic, The Agency benefited from the pandemic and grew at a substantially more rapid rate. In each of 2020 and 2021, The Agency made it to near the top of the "Inc.'s" list of the fastest growing companies in America and California.

39. As highly experienced real estate professionals, each with decades of relevant market experience, the Defendants knew at the time they applied for and received the PPP Loans that they would be the beneficiaries of a once-in-a-lifetime real estate boom and that the money was not necessary to continue their operations. Umansky and Rose anticipated and capitalized on the flight to luxury single family residences brought on by the pandemic. As real estate market experts they knew that the Federal Reserve's zero interest rate policy and mortgage backed securities buying program of quantitative easing (nearly $3 trillion dollars) would result in a boom in the real estate market. With that knowledge, they not once, but twice, took PPP money and deprived less sophisticated, but more deserving small business owners from access to capital.

40. Based on their 2019 sales, Defendants would have been flush with cash going into 2020, unless they had chosen to distribute every penny of the additional income to their owners, which no competent businessperson would do.

1  There was no economic necessity when they applied for PPP Loan 1. This is even
2  more evident in 2021 when they applied for PPP Loan 2, having increased sales by
3  $500 million 2020 and it being clear that the housing market was experiencing
4  significant growth.

5      41.    As highly experienced real estate professionals that held themselves
6  out as sophisticated real estate advisors with intimate knowledge of the real estate
7  market, Defendants knew markets can and do fluctuate greatly, including extended
8  periods of decline, and certainly for shorter term market declines that may be larger
9  than a typical downturn. Therefore, they knew the importance of maintaining
10 sufficient liquidity to continue normal business operations and adequately provide
11 real estate salesperson services for their clients (and themselves).

12     42.    With this knowledge, Defendants would have retained significant
13 reserves to continue to pay their employees.  To do otherwise would have been
14 grossly irresponsible, especially for experts in the real estate markets.  As alleged
15 above, Defendants expressly did not hold themselves out as grossly irresponsible
16 and their experience and success confirms they were not.

17     43.    This also is confirmed by the fact that Defendants have remained in
18 business and continued to employ comparable numbers of individuals in their
19 capacities during the current severe economic downturn.  Defendants' own website
20 confirms the dramatically greater impact of the current downturn compared to the
21 brief COVID related market decline which lasted only a short period of time.

22     44.    While market declines such as the short decline in 2020 may reduce
23 the amount of corporate profits, the purpose of the PPP program was not to keep
24 corporate profits high, but to make sure that companies that did not have enough
25 money to pay their employees could pay their employees.  The above facts make
26 clear that the Defendants not only remained profitable during the brief COVID
27 market decline in 2020, but greatly increased their revenue during that period, with
28 their PPP loans only adding to the amount.

45. The Agency had $6 billion of sales in 2020 and $6.5 billion in sales in 2021. Often times a real estate office will represent both the buyer and seller in a luxury sale transaction, and earn the full five percent (5%) commission. If The Agency only represented one side of the transaction in these deals, The Agency's gross revenue for 2020 and 2021 would be between $150 million and $162.5 million, respectively. Going into the pandemic The Agency was flush with cash, having earned $150 million in a record setting year in 2020. On its application for PPP Loan 1, The Agency reported 104[1] employees and sought approximately $2.3 million to protect their salaries, which annualized would equal around $11.4 million, or 7.36 percent of the gross revenue of the business. The Agency could clearly afford to pay their employees without a problem.

46. The Agency then broke the 2019 record in 2020 and earned at least $162.5 million. The Agency then shattered both the 2019 and 2020 records with $11.2 billion in sales in 2021, earning a whopping $280 million in sales commissions. When The Agency applied for PPP Loan 2 in 2021 they reported only 73 employees, with an average annualized salary of $74,028.89, which would make their payroll total cost equal to $5,404,108.97 for 2021, or 1.9 percent of their gross revenue for 2021.

47. The Agency, just like the real estate industry at large, experienced an economic boom in 2020 and 2021. The Agency increased its gross revenue from $500 million from 2019 to 2020 and by $5.5 billion from 2020 to 2021. Strangely, however, during this period of economic growth, based on the information provided on their applications, The Agency claims to have reduced the number and compensation to their workforce during this period of economic growth and prosperity, reducing the number of their employees from 104 to 73 (a 29.81%

---

[1] As discussed below, the evidence suggests that The Agency's reported number of employees was grossly inflated and likely included agents who are themselves classified as independent contractors and many of which applied for and received their own PPP loans.

reduction in the size of their workforce) and the amounts they compensated their employees, reducing their average salary from $110,552.17 to $74,028.89 (a -33.04% reduction in the average salary), all while breaking gross revenue records. The foregoing indicates that The Agency fabricated the total number of employees and their average salaries on at least their application for PPP Loan 1. There is no other explanation.

48. The fraud to protect profits here is all the more egregious because Umansky and Rose, who co-own The Agency, are already extremely wealthy individuals who each own tens of millions of dollars of real estate. Reducing or foregoing distribution of profits if necessary for a period of time would not have made it financially impossible to keep their business in operation.

49. By virtue of the above false statements, Defendants' Economic Necessity, No False Statements, Eligibility, Use of Proceeds, Understanding, Worker Retention and Payroll Certifications described above all were knowingly false, and relied upon by lenders and the SBA in approving the PPP Loans.

50. On March 31, 2022, Defendants applied for and received loan forgiveness on the second loan. The first loan had a 24 month term, meaning that the full balance was due and payable, as of April 12, 2022. However, the Defendants have failed to repay the first loan, and the first loan has not been forgiven. Plaintiff is informed and believes that Defendants have applied for, but not yet received loan forgiveness on the first loan, that is now almost a whole year past due. The SBA would not have forgiven the loans if they knew Defendants' certifications described above were false. They also would not have forgiven the loans if they knew the proceeds had been used to increase profits instead of paying their employees. Defendants already had ample liquidity to pay employees so the proceeds all went to their bottom line.

51. Defendants knew the falsity of their certifications in applying for the first PPP loan in 2020. They unquestionably knew they were false when they

applied for the second loan in 2021, because at that time, they had their year end financial results, including the record breaking results for the full year of 2020, resulting in what were likely their highest yearly profits in several years.  They knew they had not needed the first loan and certainly did not need the second. Knowing how much liquidity they had, if they truthfully believed that economic uncertainty remained that threatened their very business, they would have kept a large part of their greatly increased profits in reserve to cover future employee expenses.

52. As a result of the forgiveness and the maturity of the first loan, Defendants have not repaid either loan and have kept the proceeds, and they have been repaid instead with money from taxpayers, including the small businesses and their owners who were supposed to receive the PPP funds instead of repaying a profitable RIA's loan that it should never have received in the first place, let alone have been forgiven.

## THE FALSE CLAIMS ACT

53. The False Claims Act prohibits fraudulent conduct in connection with federal programs, including the knowing submission of false claims for payment to the government. See 31 U.S.C. § 3729(a)(1)(A). In these circumstances, liability may attach if the omission renders those representations misleading. 41. 31 U.S.C. § 3729(a)(1)(A) and (B) of the FCA provide that:

(1) . . . any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property

to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . .

    31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2020).

    42. The scope of a false or fraudulent claim is to be broadly construed. As used in the FCA, a "claim"

    (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

      (i) is presented to an officer, employee, or agent of the United States; or

      (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
(I) provides or has provided any portion of the money or property requested or demanded; or

      (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . .
31 U.S.C. § 3729(b)(2) (2020).

    54. A person who violates the False Claims Act during the time period at issue "is liable for a civil penalty as adjusted, plus 3 times the amount of damages which the United States Government sustains because of the act of that person." 31 U.S.C. § 3729(a). See 28 C.F.R. § 85.3(a)(9); Department of Justice, 28 CFR Part 85, Civil Monetary Penalties Inflation Adjustments for 2022 published at: https://www.govinfo.gov/content/pkg/FR-2022-05-09/pdf/2022-09928.pdf.

/ / /

/ / /

/ / /

# FIRST CAUSE OF ACTION

## FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729.(a)(1)(A-B))

55. Plaintiff alleges and incorporates by reference each and every allegation contained in all prior paragraphs of this complaint.

56. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

57. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(A). Specifically, each of Defendants' Economic Necessity, No False Statements, Eligibility, Use of Proceeds, Understanding, Worker Retention and Payroll Certifications described above all were knowingly false, and relied upon by lenders and the SBA in approving the PPP Loans. Their request for forgiveness contained a further misrepresentation that the loans had been used only for authorized purposes.

58. By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

59. The Government and its agents and contractors relied on those false statements in approving and making the loans and subsequently forgiving them, leaving the burden of repayment on taxpayers.

60. Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $12,537.00 and not more than $25,076.00 for each and every violation arising from Defendants' unlawful conduct alleged herein, and attorneys' fees in an amount to be proven.

/ / /

/ / /

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

## PRAYER FOR RELIEF

WHEREFORE, *qui tam* Plaintiff/Relator prays for judgment against Defendants, as follows:

1. That this Court enter judgment against each Defendant in an amount equal to three times the damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $12,537.00 and not more than $25,076.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper.
2. Such other relief as this Court may deem just and proper, together with interest and costs of this action.
3. Reasonable attorney fees, litigation expenses, and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 12, 2023            CYPRESS LLP

                                By:  /s/ Julian Brew
                                     Julian Brew, Esq.
                                     Attorneys for Plaintiff RELATOR, LLC
                                     RELATOR LLC